**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CRIMINAL ACTION NO. 3:17-CR-180-CRS**

**UNITED STATES OF AMERICA,**

                                                                            **Plaintiff,**

**v.**

**TSUNG MIN YU,**                                                           **Defendant.**

**REPORT AND RECCOMENDATION**

This matter is before the Court on a Motion to Suppress filed by Defendant, Tsung Min Yu ("Yu"). (DN 17.) The United States filed a Response to the Motion (DN 21), and Defendant Yu filed a Reply (DN 23). The Motion to Suppress was referred to the undersigned Magistrate Judge by Senior Judge Charles R. Simpson, III for a hearing, if necessary, and for findings of fact, conclusions of law, and recommendation. (DN 24.) The Court held an evidentiary hearing on August 10, 2018 and then set a deadline for the Parties to file post-hearing briefs. (DN 27, 28.) Both Defendant Yu and the United States submitted a post-hearing brief (DN 32, 33), and the United States submitted a reply addressing an argument in Defendant Yu's post-hearing brief that had not previously been raised. (DN 34.) This matter is now ripe for review.

For the reasons stated herein, the undersigned RECOMMENDS that the Motion to Suppress (DN 17) be **GRANTED IN PART** and **DENIED IN PART** as set forth below.

## I.      FINDINGS OF FACT

On December 5, 2017, Immigration and Customs Enforcement ("ICE") Deportation Officers John Cloyd ("Officer Cloyd") and Jeremy Bacon ("Officer Bacon") and ICE Supervisory Detention and Deportation Officer Michael Huffines ("Officer Huffines") arrested Yu at a residence located at 3530 Leith Lane in Louisville, Kentucky. (DN 28, at PageID # 68-69, 74,

98.)[1]  Yu had been referred to another Deportation Officer, Joseph Phelps, by the Citizens and Immigration Services Fraud Unit as a "visa overstay," meaning that Yu been granted temporary permission to enter the United States, but had stayed in the country past the date he was supposed to leave.  (*Id.* at 69.)  Specifically, Yu had arrived in the United States on June 16, 2008 and was supposed to depart by December 15, 2008.  (*Id*. at 73.)

The Officers arrived at the Leith Lane residence to arrest Yu at 6:00 A.M. and observed a black Lexis registered to Yu parked in the driveway. (*Id.* at 74-75.)  The Officers set up surveillance to see if Yu left the residence and watched for approximately an hour before approaching the door around 7:00 A.M.  (*Id.* at 75-76, 126.)  The Officers were wearing khaki or cargo pants, bulletproof vests marked "ICE" and "police," and had weapons holstered on their hips.  (*Id.* at 77, 130, 164.)  Officer Cloyd went to the door to knock while Officer Bacon stayed near the porch steps.  (*Id*. at 76, 126, 161-62.)  Officer Huffines remained in the driveway where he could see both Officers Cloyd and Bacon and the rear of the residence in case anyone decided to flee.  (*Id*.)

When Officer Cloyd knocked, a woman, who was later identified as Charlotte Klimczak ("Klimczak"), Yu's Aunt, answered the door.  (*Id.* at 70-71, 77-78, 126-27.)  Officer Cloyd told Klimczak that they were the police, and in response to Officer Cloyd's questions, Klimczak stated that she lived in the house with her niece and nephew.  (*Id.* at 78, 127-28.)  Officer Cloyd asked her nephew's name, and she replied, "Tsung Yu."  (*Id.* at 78.)  When Officer Cloyd asked if she would get her nephew, she agreed.  (*Id.* at 78-79, 128.)  While Klimczak spoke with Officer Cloyd through the closed storm door, the tone of the entire conversation was casual.  (*Id.* at 78-79, 100.)

---

[1] The undersigned will refer to the transcript of the August 10, 2018 evidentiary hearing (DN 28) by reference to the Page ID#s found in the header placed on the transcript by the Clerk at the time of filing, not the internal page numbers of the transcript itself.

Klimczak was gone briefly before she returned to the door with a male who appeared to be Yu. (*Id.* at 79-80, 129.)  While the Officers had a picture of Yu from his visa application taken approximately eleven years ago, the picture was outdated.  Officers had also looked at a current photo of Yu on Facebook before going to the Leith Lane address, but needed to verify Yu's identity prior to arresting him. (*Id.* at 80-81.)  Accordingly, Officer Cloyd identified himself as police and asked Yu who he was. (*Id.* at 81, 129.)  Yu stated that his name was David. (*Id.*)  Officer Cloyd asked if Yu had any identification, to which Yu replied that it was in his bedroom. (*Id.*)  Officer Cloyd asked if Yu could get his ID and as Yu began to turn to go in the house, Officer Cloyd asked permission to follow Yu into the house. (*Id.*)  Yu said yes. (*Id.* at 81-82, 129.)  Officer Cloyd did not demand entrance to the home and did not sense any hesitation in Yu's voice or get any indication that Yu did not want Officer Cloyd to follow Yu inside. (*Id.* at 82, 129-30.)  Klimczak, who was still standing there as Officers Cloyd and Bacon spoke with Yu, likewise did not object to the Officers entering her home. (*Id.* at 82-83, 130.)

Once inside the house, Yu opened a door, and started to go downstairs. (*Id.* at 83, 131.)  When Officer Cloyd asked Yu if they could follow him downstairs, Yu said yes. (*Id.*)  Officer Cloyd sensed no hesitation in Yu's voice. (*Id.* at 83.)  Officer Huffines remained upstairs with Klimczak. (*Id.* at 162.)  At the bottom of the stairs, in what appeared to be a bedroom, Yu went to the dresser and produced to Officers Cloyd and Bacon an international driver's license identifying him as Tsung Min Yu. (*Id.* at 84, 87, 132-33.)  Officer Cloyd asked Yu why Yu had stated his name was David, and Yu responded that David was just a name he went by since he came to the United States. (*Id.* at 87.)  However, Yu confirmed that he was Tsung Min Yu. (*Id.*)  Yu also indicated that he had a passport in his car, but was not permitted to go get it at that time. (*Id.* at 102, 133.)

Officer Cloyd asked Yu to sit on the edge of his bed, and in response to questions from Cloyd, Yu admitted that he was in the United States illegally and had overstayed his visa. (*Id.* at 87, 71.) Officer Cloyd then told Yu that the Officers were with immigration and Yu was going to have to come down to the office with them to do some paperwork, for fingerprints, and to get a court date. (*Id.* at 87, 103, 133.) However, Officer Bacon also testified that Cloyd told Yu he was being placed under arrest. (*Id.* at 145.) Whether Officer Cloyd explicitly told Yu he was under arrest or not, both Officers Cloyd and Bacon unequivocally testified that Yu was in fact under arrest at this point. (*Id.* at 103-104, 108, 116, 145, 149.)

Yu asked the Officers if it was okay to get dressed before he went with them, and they agreed to permit him to do so. (*Id.* at 88, 133-34.) As Yu began to stand up, Officer Bacon asked him if there were any weapons or anything that could harm the Officers in the room. (*Id.* at 88, 134-35.) It is undisputed that Yu had not yet received *Miranda* warnings at the time he was asked this question. (DN 32, at PageID # 191; DN 33, at PageID # 201-03, 211; DN 28, at PageID # 106, 152-53, 175, 177.) In response, Yu stated that there was a gun under the pillow on the bed, and Officer Bacon, who was standing right next to the pillow, flipped the pillow over and saw a small, Smith and Wesson handgun. (*Id.* at 88-89, 134-35.) Yu was immediately placed in handcuffs for officer safety. (*Id.* at 89-90, 137.) Yu did not resist or fight in any way and was cooperative and compliant with the Officers. (*Id.* at 90.) Yu was charged with being an unlawful alien in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(5)(A), 924(a)(2). (DN 1.)

Additional testimony was presented at the hearing regarding what happened after Yu was placed in handcuffs, including testimony regarding Yu being mirandized, waiving his *Miranda* protections, and the Officers finding ammunition and a second gun. Yu also made statements regarding where he had purchased the guns and why he had them. However, at oral argument and

4

in its post-hearing brief, the United States conceded that "the statements made by Yu after he was placed in handcuffs were made in violation of *Miranda*" and that "the ammunition and second gun that w[ere] found in Yu's dresser should be suppressed as fruits of the poisonous tree." (DN 33, at PageID # 203 n.1.)  Accordingly, the undersigned will make no findings of fact regarding the remaining testimony presented given the United States's concession.

## II.     CONCLUSIONS OF LAW

As the United States has conceded that all statements made by Yu after he was handcuffed, as well as the ammunition and second gun found, should be suppressed, the undersigned will not address Yu's arguments as to that evidence.  Instead, the undersigned construes the United States's statements as notice that it does not intend to introduce into evidence either Yu's statements made after he was handcuffed or the ammunition and second gun found in Yu's dresser.  Accordingly, the undersigned will **RECOMMEND** that Yu's Motion be **DENIED** as moot as to this evidence, but with leave to reinstate if the United States seeks to introduce the evidence in the future.

The remainder of the undersigned's analysis will address suppression of the following evidence: Yu's statement regarding a weapon prior to being handcuffed and the first gun found under Yu's pillow.  Yu argued that this evidence should be suppressed because: (1) the warrantless arrest of Yu exceeded the Officers' statutory authority; (2) Yu did not voluntarily consent to entry into his home; and (3) the arresting Officers violated Yu's constitutional rights by questioning him prior to reading Yu his *Miranda* warnings.  (DNs 17, 23, 32.)  Yu's arguments are addressed separately below.

### A.     The Officer's Statutory Authority to Arrest

In his post-hearing brief in support of suppression, Yu argued—for the first time—that the warrantless arrest of Yu exceeded the Officers' statutory authority, and therefore, his statements

and the physical evidence should be suppressed. (DN 32, at PageID # 192.) Yu argued that the officers were required to get a warrant prior to arresting Yu unless "there [was] a likelihood of the person escaping before a warrant [could] be obtained for his arrest." 8 U.S.C. § 1357(a)(2) (2017). The United States filed a Reply brief in which it stated that it did not question the Officers on this issue at the evidentiary hearing because Yu did not raise the issue in either his initial Motion to Suppress or his Reply brief. (DN 34, at PageID # 218.)

The undersigned will decline to consider Yu's argument. The argument was not raised in either Yu's initial Motion to Suppress (DN 17) or Reply (DN 23), and Yu did not argue in his posthearing brief that he was unaware or otherwise unable to make this argument in his initial Motion. Further, because Yu did not raise the argument prior to the suppression hearing, the United States was deprived of a meaningful opportunity to respond and present any testimony necessary for resolution of the issue. Courts in this Circuit routinely decline to consider arguments raised for the first time in reply briefs,[2] and in this instance, Yu's argument was raised even after the filing of a reply brief that did not address it. *See Barany-Snyder v. Weiner*, 539 F.3d 327, 331-32 (6th Cir. 2008) (characterizing as "apt" a district court's decision not to address an argument raised for the first time in a reply brief). The undersigned declines to consider Yu's argument regarding the arresting officer's statutory authority.

## B.     Consent to Enter the Home

Yu also argued that his statements and the physical evidence should be suppressed because the Officers violated Yu's Fourth Amendment rights by entering his home without either valid

---

[2] *See United States v. Bennett*, No. 3:17-cr-00032, 2017 WL 5339905, at *5 n.2 (W.D Ky. Nov. 13, 2017) ("Issues raised for the first time in a reply brief, however, are not properly before the Court."); *South Fifth Towers, LLC v. Aspen Ins. UK, Ltd.*, No. 3:15-cv-00151, 2016 WL 270459, at *5 (W.D. Ky. Jan. 21, 2016) ("The court of appeals has said that it is improper to raise an issue for the first time in a reply as it prevents the nonmoving party from having a fair opportunity to respond.").

consent or a warrant.  (DN 17; DN 32, at PageID # 189.)  It is Yu's burden as the movant to

establish a violation of a statutory or constitutional right to justify suppression of the evidence.

*United States v. Patel*, 579 Fed. App'x 449, 453 (6th Cir. 2014); *United States v. Richards*, 659.

F.3d 527, 536 (6th Cir. 2011) (quoting *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)); *United*

*States v. Rodriguez-Suaso*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*,

606 F.2d 673, 679 n.11 (6th Cir. 1979)).

The Fourth Amendment of the United States Constitution protects citizens from

unreasonable searches and seizures.  U.S. CONST. AMEND. IV.  The Supreme Court has stated that

"searches conducted outside the judicial process, without prior approval by a judge or magistrate,

are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically

established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009).  Entrance

into a private home is a search for purposes of the Fourth Amendment.  *Smith v. City of Wyoming*,

821 F.3d 697, 709 (6th Cir. 2016).

The United States argued that one of the most common exceptions, consent, is applicable

here.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of

the specifically established exceptions to the requirements of both a warrant and probable cause is

a search that is conducted pursuant to consent.").  When the United States seeks to rely on a

defendant's purported consent to constitutionally justify a search, it bears the burden of proving

that the consent was freely and voluntarily given.  *Bumper v. North Carolina*, 391 U.S. 543, 548

(1968).

The undersigned finds that the United States has met its burden in this case.  The Officers

unequivocally testified that they asked Yu for permission both to enter the home and to follow Yu

downstairs to the basement.  (DN 28, at PageID# 81-83, 129-131.)  In both cases, Yu said, "Yes,"

without hesitation. (*Id.*) Yu presented no evidence to contradict this testimony. Instead, Yu

argued that his consent to enter his home resulted from coercion and duress and was therefore

involuntary. (DN 32, at PageID # 189.) In support of his argument, Yu relied on a Ninth Circuit

case: *LaDuke v. Nelson*, 762 F.2d 1318, 1326 (9th Cir. 1985).

In *LaDuke*, the Ninth Circuit affirmed a district court injunction that prohibited the

Immigration and Naturalization Service ("INS") from conducting warrantless checks of migrant

farm housing without either probable cause or reasonable suspicion. *Id.* at 1321. Pursuant to INS

practice, armed Border Patrol agents would surround a house in the early morning/late evening in

emergency vehicles with flashing lights, station officers at all entry points, and approach with only

flashlights. *Id.* The plaintiffs brought a class action alleging this practice violated their Fourth

Amendment rights, and the Ninth Circuit affirmed the district court's finding that any consent

given by the farm occupants under those circumstances was not voluntary. *Id.* at 1329. The district

court relied on the following facts in support of its finding that any consent was not voluntary:

> the uniform failure of the agents to advise the occupants of the right to refuse; the
> inherent fear that the residents of the camp have of uniformed officers because of
> their Mexican heritage; the limited lingual and educational background of the
> housing occupants; the early morning or late evening hours of the checks; and the
> occupant's knowledge of the "power which INS has in dealing with them" as
> opposed to the average citizen.

*Id.* (quoting *LaDuke v. Nelson*, 560 F. Supp. 158, 163 (E.D. Wash. 1982)).

The undersigned finds the instant case distinguishable from *LaDuke*. Yu was not awakened

by flashing lights to find his home surrounded with Officers guarding every door and window.

Further, unlike the concerns raised by the lingual and education background of the plaintiffs in

*LaDuke,* all the Officers testified that Yu's command of English was strong and they did not have

any concern he did not understand what they were asking him. (DN 28, at PageID # 98, 139, 170.)

While the ICE Officers were armed and they did approach the home early in the morning, these

8

facts alone are not enough to combat the ICE Officers' testimony regarding Yu's cooperative demeanor and lack of hesitation in permitting them entry to the house and in permitting them to follow him to his bedroom. Yu argued that the appearance of three armed ICE agents at 7:00 A.M. in the morning "in the current political climate" was "stressful and fear-inducing." (DN 32, at PageID # 189-90.) However, this is insufficient in light of the other facts regarding his cooperation and verbal consent. The undersigned finds that Yu voluntarily consented to the Officers entry into his home and bedroom, and the United States has met its burden regarding the consent exception to the Fourth Amendment's warrant requirement. Accordingly, Yu's argument regarding lack of consent fails.

### C.      Failure to Give *Miranda* Warnings

Yu also argued that his statements and the physical evidence should be suppressed because he was interrogated while in custody prior to receiving *Miranda* warnings in violation of his Fifth Amendment rights. (DN 32, at PageID # 195-96.) Where a defendant seeks suppression based upon a failure to receive warnings pursuant to *Miranda*, he must demonstrate by a preponderance of the evidence that he was subjected to a custodial interrogation. *United States v. Lawrence*, 892 F.2d 80, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989) (per curiam) (unpublished opinion) (citing *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986) and *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984); *United States v. Roberts,* No. 13-48, 2014 WL 2946650, at *3 (E.D. Ky. June 30, 2014)).

Under the Fifth Amendment, a defendant may not be "compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. This privilege is applicable during a period of custodial interrogation. *Colorado v. Spring*, 479 U.S. 564, 572 (1987); *Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966). Custodial interrogation is "questioning initiated by law enforcement

officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. To protect this right, the Supreme Court mandated in *Miranda*, that, prior to any custodial interrogation, the person being questioned "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* If, however, the defendant is not in custody, *Miranda* does not apply. *United States v. Galloway*, 316 F.3d 624, 628-29 (6th Cir. 2003) (quoting *Miranda*, 384 U.S. at 477) ("*Miranda* warnings are necessary only if the defendant is subjected to a 'custodial interrogation.'"). Because it is undisputed that Yu was asked whether there were any weapons in the room prior to receiving his *Miranda* warnings, the sole question is whether Yu was subjected to a custodial interrogation.

Neither Yu nor the United States makes any argument regarding the "interrogation" element of custodial interrogation. The protection of *Miranda* is only triggered upon either "express questioning or its functional equivalent." *Rhode Island v.* Innis, 446 U.S. 291, 300-01 (1980). This includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301. Here, Yu was subjected to questioning regarding the presence of weapons that was reasonably likely to—and did—elicit an incriminating response. Therefore, the undersigned finds that this element has been met.

The Parties focused their arguments on the "custody" element of custodial interrogation. The United States contended that Yu was not "in custody" at the time he was asked about weapons, and therefore, *Miranda*'s mandate does not apply. (DN 33, at PageID # 210-11.) At oral argument, Yu argued that he was in custody at the time he was asked about weapons because he was under arrest. Whether an individual was in custody for purposes of *Miranda* is an objective inquiry. The

Court is required to consider all the circumstances surrounding the interrogation and determine whether "there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  The Court looks at multiple factors in making this assessment, including "the location of the interview, the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009).  The United States argues that the application of the factors requires a conclusion that Yu was not in custody at the time he was asked whether there were any weapons in the room.  (DN 33, at PageID # 212-215.)

The undersigned finds the application of the factors in this case is unnecessary as the uncontradicted testimony of the Officers was that Yu was under arrest at the time he was questioned about weapons.  After asking Yu questions to establish his immigration status, Officer Cloyd told Yu that Yu was going to have to come down to the office with the officers to do some paperwork, be fingerprinted, and get a court date.  (DN 28, at 87, 103, 133.)  Indeed, Officer Bacon even testified that Officer Cloyd explicitly told Yu he was being placed under arrest.  (*Id.* at 145.)  Whether or not Yu was explicitly told he was under arrest, both Officers Cloyd and Bacon agreed that Yu *was* under arrest at the time he was questioned about weapons.  (*Id.* at 103-104, 108, 116, 145, 149.)  Officer Cloyd testified that Yu was not free to leave the room or the presence of the Officers.  (*Id.* at PageID # 88.)  Further, the testimony presented at the hearing before the undersigned demonstrates that Yu was subjectively aware of this restriction because he asked permission to get dressed before he left with the Officers. (*Id.* at 88, 133-34.)  It was only after Yu

11

requested permission to get dressed that the Officers inquired as to weapons. (*Id.* at 88, 134-35.) The undersigned finds that Yu was under arrest prior to being asked about weapons.

The United States cites to *United States v. Robinson*, 217 Fed. App'x 503 (6th Cir. 2007), in support of its argument that Yu was not in custody. However, the defendant in *Robinson* was not under arrest at the time he was questioned. Accordingly, the undersigned does not consider *Robinson* to be dispositive of the present case. The United States further argued at oral argument that there was a "break in custody" for the period in which Yu was going to be permitted to move about his room. However, counsel for the United States conceded that he had no case law in support of his notion of a "break in custody." Because Yu was under arrest, the undersigned finds that he was in custody for purposes of *Miranda*. As Yu was subjected to custodial interrogation and the Officers did not administer *Miranda* warnings, Yu's statements made after the point of arrest must be excluded from evidence under *Miranda*. *See Oregon v. Elstad*, 470 U.S. 298, 317 (1985) ("When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the [government's] case in chief."); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1516-17 (6th Cir. 1988). Because of the United States's concession regarding all statements made after Yu was handcuffed, the only statement to be excluded is Yu's statement that there was a gun under his pillow. (*See* DN 33, at PageID # 203 n.1.)

The undersigned notes that "officer safety" was frequently mentioned during both the suppression hearing and oral argument on Yu's Motion. The Officers unequivocally testified that the purpose of asking Yu whether there were any weapons in the room was to ensure the safety of the Officers as Yu was going to be permitted to move about the room to get dressed. (DN 28, at PageID # 105, 107, 152.) The undersigned does not dispute either that this was the true purpose

of the question or that officer safety is a valid concern.  However, the United States has cited to no

authority presenting an independent officer safety exception to *Miranda*'s protections, nor is the

undersigned aware of any.[3]  As the United States has not proved the existence of any valid

exception to *Miranda*'s protections, the undersigned will **RECOMMEND** Yu's Motion be

**GRANTED** as to Yu's statement regarding the gun under his pillow made after the point of arrest.

Yu also argued that if his statements were obtained in violation of *Miranda*, the physical

evidence should be excluded as the fruit of the poisonous tree.  (DN 32, at PageID # 196.)  In

support of his argument, Yu cites to *United States v. Patane*, 542 U.S. 630, 633-34 (2004), which

stands for the exact opposite of Yu's position.  Patane was out on bond after being arrested for

harassing his ex-girlfriend.  *Id.* at 634.  Police Officers learned from Patane's probation officer

both that Patane had allegedly telephoned his ex in violation of the terms of a temporary restraining

order and that Patane, who had a previous felony conviction, illegally possessed a handgun.  *Id.* at

634-35.  When the officers arrived to arrest Patane for violating the restraining order, Patane did

not let the officers finish advising him of his *Miranda* rights.  *Id.*  In response to questioning,

Patane then both admitted that he had a gun and gave his consent for the officers to retrieve it from

his bedroom.  *Id.*  Patane was prosecuted for being a felon in possession of a handgun.

The Supreme Court reversed the Tenth Circuit's opinion excluding the gun as being the

unlawful fruit of Patane's unwarned statements.  *Id.* at 636.  A majority of the Court concluded

that *Miranda*'s protection applied to violations of the Fifth Amendment's Self-Incrimination

clause, which was not implicated by the admission of nontestimonial, physical evidenced derived

---

[3] While there is a "public safety" exception to *Miranda*, the exception only applies where officers "have a reasonable belief based on articulable facts that they are in danger." *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). To have a reasonable belief, an officer must have reason to believe both that defendant might have or recently has had a weapon and "that someone other than the police might gain access to that weapon and inflict harm with it." *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007).  No such showing was made or even argued in this case.

from voluntary and non-coerced statements.  *Id.* at 634 (plurality opinion); *Id.* at 645 (Kennedy, J., concurring).

The Sixth Circuit, applying *Patane*, has likewise observed that "[t]he Fifth Amendment's protection against compelled self-incrimination, from which *Miranda*'s warning requirement is derived, . . . prevents the government from introducing unwarned statements against a criminal defendant at trial, but it does not apply to physical evidence." *United States v. Reese*, 509 Fed. App'x 494, 503 (6th Cir. 2012).  *See also United States v. Lewis*, 110 Fed. App'x 569, 572 (6th Cir. 2004); *United States v. Ward*, 400 Fed. App'x 991, 996 (6th Cir. 2010). Only where the physical evidence at issue is the fruit of an involuntary or coerced statement is exclusion justified. *See Reese*, 509 Fed. App'x at 503 n.2; *Lewis*, 110 Fed. App'x at 572.

In the instant case, Yu has not argued or offered evidence sufficient to support a conclusion that his statement regarding that gun was involuntary or coerced.  Accordingly, the undersigned **RECOMMENDS** Yu's Motion be **DENIED** as to the gun found under Yu's pillow.

## III.    RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that Yu's Motion to Suppress (DN 17) be **GRANTED IN PART AND DENIED IN PART** as follows.

(1)     The undersigned **RECCOMENDS** that Yu's Motion (DN 17) be **DENIED** as moot as to any statements made by Yu after he was handcuffed, the ammunition, and the second gun found in Yu's bedroom, with leave to refile the Motion if the United States seeks to introduce the evidence.

(2)     The undersigned **RECOMMENDS** that Yu's Motion (DN 17) be **GRANTED** as to Yu's statement regarding the gun under his pillow made after he was arrested.

14

(3)    The undersigned **RECOMMENDS** that Yu's Motion (DN 17) be **DENIED** as to the first gun found under Yu's pillow**.**

cc:  Counsel of record

**<u>Notice</u>**

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations. Fed. R. Crim. P. 59(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).