UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                               PLAINTIFF

v.                                            CRIMINAL ACTION NO. 3:17-CR-180-CRS

Tsung Min YU                                                          DEFENDANT

# MEMORANDUM OPINION

## I.      Introduction

This case is before the Court on Defendant Tsung Min Yu's motion to suppress (DN 17), the report and recommendation of Magistrate Judge Colin H. Lindsay on that motion (the "Report") (DN 38), and objections filed thereto (DN 39). Yu objects to the magistrate's decision not to suppress evidence of a gun found under Yu's pillow. In doing so, he argues that the officers were without authority to make the arrest and that the statements leading the officers to the gun were made involuntarily. The first argument was not reached by the magistrate because he found it to be untimely. The Court disagrees with that conclusion but, on the merits, agrees that the gun should not be suppressed, since the United States has represented that a valid warrant existed. As to the second argument, the Court finds the statements voluntarily made and insufficient to warrant suppression. Therefore, the Court will accept and adopt the Report as supplemented by this opinion, overrule the objections in part, and sustain the objections in part. As a result, the Court will grant the motion to suppress in part and deny the motion to suppress in part.

## II.     Factual Background and Procedural History

Yu makes no objections to the factual findings of the magistrate. Therefore, the Court adopts and repeats the factual findings of the magistrate in whole:

On December 5, 2017, Immigration and Customs Enforcement ("ICE") Deportation Officers John Cloyd ("Officer Cloyd") and Jeremy Bacon ("Officer Bacon") and ICE Supervisory Detention and Deportation Officer Michael Huffines ("Officer Huffines") arrested Yu at a residence located at 3530 Leith Lane in Louisville, Kentucky. (DN 28, at PageID # 68-69, 74, 98.) Yu had been referred to another Deportation Officer, Joseph Phelps, by the Citizens and Immigration Services Fraud Unit as a "visa overstay," meaning that Yu been granted temporary permission to enter the United States, but had stayed in the country past the date he was supposed to leave. (*Id*. at 69.) Specifically, Yu had arrived in the United States on June 16, 2008 and was supposed to depart by December 15, 2008. (*Id*. at 73.)

The Officers arrived at the Leith Lane residence to arrest Yu at 6:00 A.M. and observed a black Lexis registered to Yu parked in the driveway. (*Id*. at 74-75.) The Officers set up surveillance to see if Yu left the residence and watched for approximately an hour before approaching the door around 7:00 A.M. (*Id*. at 75-76, 126.) The Officers were wearing khaki or cargo pants, bulletproof vests marked "ICE" and "police," and had weapons holstered on their hips. (*Id*. at 77, 130, 164.) Officer Cloyd went to the door to knock while Officer Bacon stayed near the porch steps. (*Id*. at 76, 126, 161-62.) Officer Huffines remained in the driveway where he could see both Officers Cloyd and Bacon and the rear of the residence in case anyone decided to flee. (*Id*.)

When Officer Cloyd knocked, a woman, who was later identified as Charlotte Klimczak ("Klimczak"), Yu's Aunt, answered the door. (*Id*. at 70-71, 77-78, 126-27.) Officer Cloyd told Klimczak that they were the police, and in response to Officer Cloyd's questions, Klimczak stated that she lived in the house with her niece and nephew. (*Id*. at 78, 127-28.) Officer Cloyd asked her nephew's name, and she replied, "Tsung Yu." (*Id*. at 78.) When Officer Cloyd asked if she would get her nephew, she agreed. (*Id*. at 78-79, 128.) While Klimczak spoke with Officer Cloyd through the closed storm door, the tone of the entire conversation was casual. (*Id*. at 78-79, 100.)

Klimczak was gone briefly before she returned to the door with a male who appeared to be Yu. (*Id.* at 79-80, 129.) While the Officers had a picture of Yu from his visa application taken approximately eleven years ago, the picture was outdated. Officers had also looked at a current photo of Yu on Facebook before going to the Leith Lane address, but needed to verify Yu's identity prior to arresting him. (*Id*. at 80-81.) Accordingly, Officer Cloyd identified himself as police and asked Yu who he was. (*Id*. at 81, 129.) Yu stated that his name was David. (*Id*.) Officer Cloyd asked if Yu had any identification, to which Yu replied that it was in his bedroom. (*Id*.) Officer Cloyd asked if Yu could get his ID and as Yu began to turn to go in the house, Officer Cloyd asked permission to follow Yu into the house. (*Id*.) Yu said yes. (*Id*. at 81-82, 129.) Officer Cloyd did not demand entrance to the home and did not sense any hesitation in Yu's voice or get any indication that Yu did not want Officer Cloyd to follow Yu inside. (*Id*. at 82, 129-30.) Klimczak, who was still standing there as Officers Cloyd and Bacon spoke with Yu, likewise did not object to the Officers entering her home. (*Id*. at 82-83, 130.)

Once inside the house, Yu opened a door, and started to go downstairs. (*Id*. at 83, 131.) When Officer Cloyd asked Yu if they could follow him downstairs, Yu

said yes. (*Id.*) Officer Cloyd sensed no hesitation in Yu's voice. (*Id.* at 83.) Officer Huffines remained upstairs with Klimczak. (*Id.* at 162.) At the bottom of the stairs, in what appeared to be a bedroom, Yu went to the dresser and produced to Officers Cloyd and Bacon an international driver's license identifying him as Tsung Min Yu. (*Id.* at 84, 87, 132-33.) Officer Cloyd asked Yu why Yu had stated his name was David, and Yu responded that David was just a name he went by since he came to the United States. (*Id.* at 87.) However, Yu confirmed that he was Tsung Min Yu. (*Id.*) Yu also indicated that he had a passport in his car, but was not permitted to go get it at that time. (*Id.* at 102, 133.)

      Officer Cloyd asked Yu to sit on the edge of his bed, and in response to questions from Cloyd, Yu admitted that he was in the United States illegally and had overstayed his visa. (*Id.* at 87, 71.) Officer Cloyd then told Yu that the Officers were with immigration and Yu was going to have to come down to the office with them to do some paperwork, for fingerprints, and to get a court date. (*Id.* at 87, 103, 133.) However, Officer Bacon also testified that Cloyd told Yu he was being placed under arrest. (*Id.* at 145.) Whether Officer Cloyd explicitly told Yu he was under arrest or not, both Officers Cloyd and Bacon unequivocally testified that Yu was in fact under arrest at this point. (*Id.* at 103-104, 108, 116, 145, 149.)

      Yu asked the Officers if it was okay to get dressed before he went with them, and they agreed to permit him to do so. (*Id.* at 88, 133-34.) As Yu began to stand up, Officer Bacon asked him if there were any weapons or anything that could harm the Officers in the room. (*Id.* at 88, 134-35.) It is undisputed that Yu had not yet received Miranda warnings at the time he was asked this question. (DN 32, at PageID # 191; DN 33, at PageID # 201-03, 211; DN 28, at PageID # 106, 152-53, 175, 177.) In response, Yu stated that there was a gun under the pillow on the bed, and Officer Bacon, who was standing right next to the pillow, flipped the pillow over and saw a small, Smith and Wesson handgun. (*Id.* at 88-89, 134-35.) Yu was immediately placed in handcuffs for officer safety. (*Id.* at 89-90, 137.) Yu did not resist or fight in any way and was cooperative and compliant with the Officers. (*Id.* at 90.) Yu was charged with being an unlawful alien in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(5)(A), 924(a)(2). (DN 1.)

      Additional testimony was presented at the hearing regarding what happened after Yu was placed in handcuffs, including testimony regarding Yu being mirandized, waiving his Miranda protections, and the Officers finding ammunition and a second gun. Yu also made statements regarding where he had purchased the guns and why he had them.

DN 38 at 1–4.

Yu filed his motion to suppress on November 20, 2018. DN 17. The United States, with an extension of time from the Court (DN 22), responded on May 10, 2018. DN 21. Yu replied on May 16, 2018. DN 23. The motion to suppress was referred to the magistrate on May 22, 2018. DN 24. The magistrate conducted an evidentiary hearing on August 10, 2018 and permitted the

parties to file post-hearing briefs. Both Yu and the United States submitted briefs. DNs 32, 33. The United States also submitted a response to Yu's brief. DN 34. The magistrate issued his Report on November 20, 2018. DN 38. Yu filed objections December 4, 2018. DN 39.

**III.      Legal Standard**

The Court makes a *de novo* determination of the proposed findings or recommendations of the magistrate to which the parties have objected. 28 U.S.C. § 636(b)(1)(C); FED. R. CRIM. P. 59(b)(3). To the extent that no objection is filed, the arguments are waived. *Thomas v. Arn*, 728 F.2d 813, 815 (6th Cir. 1984), *aff'd*, 474 U.S. 140, 147–48 (1985).

**IV.      Discussion**

The magistrate recommended that the motion to suppress be granted in part and denied in part. DN 38. Specifically, he recommended that Yu's motion be: denied as moot as to any statements made by Yu after he was handcuffed, the ammunition, and the second gun found in Yu's bedroom, with leave to refile the motion if the United States seeks to introduce the evidence[1]; granted as to Yu's statement regarding the gun under his pillow made after he was arrested; and denied as to the gun found under Yu's pillow. DN 38 at 14–15. The United States filed no objections. Yu objected only to the magistrate's conclusion regarding the first gun, which was found under Yu's pillow. DN 39. Therefore, the Court constrains its *de novo* review to that issue.

In his objections, Yu offers two grounds for excluding the gun. First, Yu urges that the officers lacked statutory authority to arrest Yu and that the gun should be excluded as fruit of the poisonous tree. Second, Yu argues that the statement regarding the location of the gun was given

---

[1] The magistrate noted that the United States "conceded that all statements made by Yu after he was handcuffed, as well as the ammunition and second gun found, should be suppressed." DN 38 at 5. He construed those concessions as notice that the United States would not introduce that evidence and, on that ground, denied the motion as moot. *Id*.

4

involuntarily and that, as a result, the physical evidence obtained as a result must also be excluded.

### i. Lack of Statutory Authority

The Attorney General is permitted to arrest aliens pending deportation proceedings with an administrative warrant. 8 U.S.C. § 1226. *See also Abel v. United States*, 362 U.S. 217, 232–34 (1960) (discussing the history of administrative warrants in immigration). ICE agents may also effectuate an arrest without a warrant, as relevant to this case, when (1) they encounter an alien who is present in the United States illegally and is likely to escape before a warrant can be issued for his arrest, 8 U.S.C. § 1357(a)(2), or (2) the agents witness a person committing another crime in their presence, 8 U.S.C. § 1357(a)(5)(A).

Yu's argument is that he was arrested without a warrant prior to the questioning regarding the guns. DN 39 at 1. Therefore, he argues, his arrest must be based on § 1357(a)(2), rather than § 1357(a)(5)(A), because the officers were not aware of the presence of the guns. *Id*. As to § 1357(a)(2), he further argues that the officers would not be able to demonstrate that Yu was "likely to escape before a warrant can be obtained for his arrest" as required by the statute. *Id*. As a result, he concludes that his arrest was undertaken outside of the agents' statutory authority.

The magistrate declined to consider the argument because, in his view, it was not raised in the initial motion to suppress or the reply. DN 38 at 6. Yu argues that is a mischaracterization because he brought up the confusion regarding his arrest in his motion to suppress. *See* DN 17 at 1 ("some documents claim that Mr. Yu was under arrest before being asked about weapons, and others state that he was arrested after being asked about weapons"). It was not until the hearing,

he argues, that the officers all testified that Yu was under arrest prior to being asked about the weapons.

Yu appears to be correct on the threshold issue. Yu originally raised the issue in his motion to suppress, though not couched in the same terms as presented in his post-hearing brief. The confusion regarding the timing and reasoning for his arrest was unclear at the discovery stage and necessitated a factual hearing by the magistrate. It was only at the hearing that the events surrounding the arrest became clearer. For those reasons, the magistrate erred in declining to consider the argument. Regardless, the Court may consider arguments untimely made if the party so requesting shows good cause. FED. R. CRIM. P. 12(c)(3). The factual issues referenced above that necessitated the hearing provide this good cause. Further, the United States had the opportunity to respond (DN 34) and would not be prejudiced by the Court considering the argument.

The argument in the motions and post-hearing briefs revolved around what statute would apply to the warrantless search of Yu.[2] However, counsel for the United States represented that an immigration arrest warrant had been issued under the administrative regulations governing such procedures, DN 28 at 3, and Yu's counsel stated on the record that he understood an immigration warrant existed, *Id*. at 4. Further, Cloyd testified that he had an immigration warrant

---

[2] In that respect, the United States had argued in its' post-trial brief that "Yu was not arrested for this immigration violation, rather, he was arrested for being an alien in possession of a firearm in violation of 18 U.S.C. § 922(g)(5)(A), which Officer Cloyd had authority to do pursuant to []8 U.S.C. § 1357(a)(5)(A)." DN 34 at 4. However, it was the "uncontradicted testimony of the Officers that Yu was under arrest at the time he was questioned about weapons." DN 38 at 11. The magistrate's description of the encounter confirmed that testimony. *See Id*. ("Yu was not free to leave the room or the presence of the Officers."). Therefore, since the arrest had occurred prior to the officers asking or learning about the weapons, the arrest cannot be justified by reference to the firearm charge or § 1357(a)(5)(A). The United States asserts that, if Cloyd were given the opportunity to testify again, he would demonstrate that Yu was "likely to escape before a warrant can be obtained for his arrest" to satisfy § 1357(a)(2). Given the Court's holding, further fact-finding is not necessary. However, were some deficiency to exist in the warrant such that the officers were forced to rely on § 1357(a)(2), an additional hearing would likely be necessary.

6

for Yu's arrest. *Id*. at 25. Such a warrant would authorize the arrest of Yu for immigration violations, though not the entry into the apartment. Having found that the entry into the apartment was already consensual, there was no constitutional issue presented by the officers confirming Yu's identity and then arresting him.

An arrest pursuant to a valid administrative warrant permits the officer to conduct a search incident to arrest akin to that following execution of a judicially-issued arrest warrant. *Abel*, 362 U.S. at 235–37. The officer is then permitted to search for weapons or evidence "on the accused's person or under his immediate control." *Chimel v. California*, 395 U.S. 752, 764 (1969). This would include underneath the pillow on the bed where Yu was sitting, particularly once the officers had knowledge of the presence of firearms. On this point, *Abel* is factually similar. There, agents conducted a search for weapons and documents in Abel's hotel room following his arrest. *Abel*, 326 U.S. at 223-24. In the course of that search, the agents discovered various items later used as evidence in Abel's prosecution for espionage. *Id*. at 219-20. The Court held that this evidence was admissible in that trial, notwithstanding that the seized articles were unrelated to the immigration offense for which the administrative warrant was issued. *Id*. at 228-30.

Without a Fourth Amendment violation, there is no poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963). However, to any extent that the officer's conduct could have yielded a Fourth Amendment violation, the violation would be sufficiently attenuated by the valid arrest warrant such that exclusion is not required. *Utah v. Strieff*, 136 S. Ct. 2056, 2061–62 (2016) ("a valid arrest warrant was a sufficient intervening event to break the causal chain" between an unlawful seizure and the discovery of evidence of wrongdoing). To ensure that such a warrant existed, the Court will order the United States to file the administrative warrant used to

7

arrest Yu within fourteen days of entry of this order. If the United States is unable to do so or the warrant proves invalid, Yu would be entitled to reinstate his motion to suppress on this issue and an evidentiary hearing would be required for the United States to attempt to demonstrate that Yu was "likely to escape before a warrant can be obtained for his arrest."

### ii. Involuntary Statements

The Fifth Amendment's Self-Incrimination Clause does not protect against nontestimonial evidence obtained as a result of voluntary statements. *United States v. Patane*, 542 U.S. 630, 637 (2004). Therefore, failure to give the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), does not make subsequent physical evidence automatically excludable. *Patane*, 542 U.S. at 644. However, "the physical fruit of actually coerced statements" are excluded. *Id.*

When considering voluntariness of statements, the Court considers the "totality of the circumstances" to determine whether a statement was the "product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). In such a scenario, "the government bears the burden of proving by a preponderance of the evidence that the [statement] was in fact voluntary[ily made]." *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003). In determining whether a statement is involuntarily made, the Sixth Circuit has established three requirements that must be met: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citation omitted).

Yu argues he was coerced "by the presence of armed ICE agents in his bedroom while he was in handcuffs and faced a threat of deportation, without having been informed that he had a right to remain silent and a right to consult with an attorney." DN 39 at 2. In making the argument, Yu relies on *LaDuke v. Nelson*, 762 F.2d 1318, 1326 (9th Cir. 1985). There, the Immigration and Naturalization Service ("INS"), the predecessor to ICE, was conducting farmhouse raids without a warrant, probable cause, or articulable suspicion. *Id.* at 1321. The armed INS agents would periodically cordon off migrant housing during early morning or late evening hours, surround the residences in emergency vehicles with flashing lights, approach the homes with flashlights, and station officers at all doors and windows to prevent egress before conducting house-to-house searches. *Id.* at 1321. This "show of official force" was exacerbated by the relationship between the government and the "vulnerable . . . migrant workforce":

> the uniform failure of the agents to advise the occupants of the right to refuse; the inherent fear that the residents of the camp have of uniformed officers because of their Mexican heritage; the limited lingual and educational background of the housing occupants; the early morning or late evening hours of the checks; and the occupant's knowledge of the "power which INS has in dealing with them" as opposed to the average citizen.

*Id.* As a result, the government could not demonstrate that any consent given was voluntary. *Id.* at 1329.

As the Ninth Circuit correctly noted, courts have examined similar factors for voluntariness. *See e.g. Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 248 (1973) (considering "minimal schooling, low intelligence, and the lack of any effective warnings to a person of his rights," "the youth of the accused," "the length of detention," "the repeated and prolonged nature of the questioning," and "the use of physical punishment such as the deprivation of food or sleep"); *United States v. Rodriguez*, 525 F.2d 1313, 1316 (10th Cir. 1975) (lack of fluency in English); *United States v. Marshall*, 488 F.2d 1169, 1187–89 (9th Cir. 1973) ("overwhelming

9

display of authority under the compulsion of the badge and the guns"); *Harless v. Turner*, 456 F.2d 1337, 1338 (10th Cir. 1972) (defendant awakened by four officers at 1:45 AM).

Certainly, Yu was under some pressure as the target of an arrest warrant. That is also exacerbated by his immigration status and the *Miranda* violations occurring during the conversation. However, as the magistrate correctly noted, this case is a far cry from *LaDuke* and other cases finding involuntary statements. Rather than being awakened at 1:45 AM surrounded by flashing emergency vehicles and many officers with their guns drawn, Klimczak and Yu met two officers, without weapons drawn, who remained behind a storm door, at 7:00 AM. DN 38 at 2. Further, the officers testified that Yu was able to speak and understand English and did not hesitate to follow their requests. *Id*. at 8. The remainder of the encounter appeared to be equally calm. As a result, the encounter was not objectively coercive as required by *Mahan* and, under the totality of the circumstances, the government has proved by a preponderance that the statement was made voluntarily.

## V.     Conclusion

The arrest was made pursuant to an administrative warrant. Further, any statements made were made voluntarily. Therefore, without constitutional violation, suppression is not warranted for the first gun. Without objection to the magistrate's ruling on the other pieces of evidence, the Court will adopt those rulings. Therefore, the Court will: deny the motion as to any statements made by Yu after he was handcuffed, the ammunition, and the second gun found in Yu's bedroom, with leave to refile the motion if the United States seeks to introduce the evidence; grant the motion as to Yu's statement regarding the gun under his pillow made after he was arrested; and deny the motion as to the first gun found under Yu's pillow, conditioned on the

United States producing a valid administrative arrest warrant within fourteen days of entry of this opinion and order.

January 14, 2019

**Charles R. Simpson III, Senior Judge
United States District Court**